2014 COA 90

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Antonio RIOS, Defendant–Appellant.**

**Court of Appeals No. 11CA2032**

Colorado Court of Appeals, Div. II.

Announced July 17, 2014

John W. Suthers, Attorney General, Melissa D. Allen, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Martinez Law, LLC, Esteban A. Martinez, Longmont, Colorado, for Defendant–Appellant.

Opinion by JUDGE BERGER

¶ 1 Defendant, Antonio Rios, appeals the judgment of conviction entered on jury verdicts finding him guilty of second degree murder and first degree assault. We reverse and remand for a new trial.

## I. Background

¶ 2 The charges against defendant arose from a gang-related fight that resulted in the death of a sixteen-year-old (the victim). The

night of the incident, two separate parties were held at the residences of Eric Garcia and Albert Martinez. The victim attended Garcia's party, and defendant was at Martinez's.

¶ 3 Defendant and Garcia were members of rival gangs. Following an exchange of text messages and an initial altercation that ended when police sirens were heard, defendant's group and Garcia's group agreed to meet for another fight at a park down the street from Garcia's residence. Defendant's group drove to the park, but Garcia's group was not there when they arrived.

¶ 4 Defendant's group decided to drive to Garcia's house, but on the way they encountered Garcia's group, who were on foot, in the street. Everyone in defendant's group, except for Lakiesha Vigil, got out of their cars and began fighting with Garcia's group. Defendant's group did not have any weapons, but Garcia testified that at least one person in his group had brought a baseball bat.

¶ 5 The fight eventually moved to a driveway of one of the houses bordering the street. At that point, Vigil drove her car into the crowd of people fighting, although the record is unclear regarding why she did so. Her car became stuck on a brick or rock retaining wall lining the driveway. Members of Garcia's group surrounded the car and proceeded to throw rocks at it and hit it with objects, breaking the windows. Defendant and Martinez were eventually able to free the car from the retaining wall. Because Vigil was pressing the gas pedal when the car was freed, the car lurched forward, hitting the victim and pinning his upper torso against the wall.

¶ 6 Vigil then drove the car out of the driveway. Martinez testified that after Vigil moved the car, he saw the victim kneeling on the ground and defendant and defendant's cousin, Anthony Quintana, standing over him. He saw defendant hit the victim with a bat a few times. Martinez then got into Vigil's car. A short time later, defendant and Quintana got into the back seat of the car, bringing the bat with them.

¶ 7 The only other participant who testified that he saw defendant and Quintana attack the victim was Oscar Sandoval. Sandoval testified that he saw defendant and Quintana hitting the victim with a three- or four-foot-long "[s]tick or something." He could not tell whether it was defendant or Quintana holding the object. He was also in Vigil's car when defendant and Quintana got in and he also noticed a bat had been brought into the car. Sandoval and a neighbor who witnessed the events from her window both testified that they saw the victim being hit in the head with the object but could not identify whether it was defendant or Quintana who wielded it.

¶ 8 The victim died at the hospital several hours after the incident. Martinez testified that upon learning of the victim's death the following day, defendant bragged that he got a "teardrop," which Martinez testified was a tattoo "they" (presumably the members of the gang with which defendant was affiliated) got when they killed somebody.

¶ 9 Defendant, Quintana, and Vigil were all charged with the victim's death and tried separately. Defendant was tried both as a principal and under a complicity theory of liability. At defendant's trial, the prosecution's theory was that the victim's death was caused both by the car hitting his chest and the baseball bat striking his head. Defendant's theory was that the victim died from injuries to his lungs caused by the impact of the car, and he presented testimony from an expert that the victim's head injury was not the cause of death.

¶ 10 Defense counsel alternatively argued that defendant never hit the victim in the head with the bat. Defendant did not testify, but the prosecution introduced a recording of defendant's interview with the police in which he admitted that he hit the victim in the arm with the bat "like three times" but denied ever hitting him in the head. He said that Quintana took the bat from him after he hit the victim in the arm.

¶ 11 The prosecution had entered into a plea agreement with Quintana, under which he was required to testify at defendant's trial. The prosecution expected him to testify that he hit the victim in the back with the bat, and then defendant took the bat from him and hit the victim in the head. Howev-

er, Quintana refused to testify when he was called as a witness.

¶ 12 Defendant was convicted of second degree murder and first degree assault. He was sentenced to imprisonment for thirty years on each count, to be served concurrently.

¶ 13 Defendant appeals, arguing: (1) the trial court improperly instructed the jury regarding Quintana's refusal to testify; (2) the prosecution engaged in prosecutorial misconduct by calling Quintana as a witness; (3) the trial court incorrectly instructed the jury regarding the prosecution's burden of proof with respect to the affirmative defense of self-defense; (4) the trial court erred in instructing the jury on the initial aggressor and provocation exceptions to self-defense; (5) the trial court erred in instructing the jury on the combat-by-agreement exception to self-defense; and (6) the cumulative effect of the errors committed during defendant's trial deprived him of a fair trial.

## II. The Trial Court's Instruction on the Witness's Refusal to Testify

### A. Facts and Analysis

¶ 14 In opening statement, the prosecutor told the jury:

> It is no secret in this case that one of the co-defendants, Adrian Quintana, was offered a plea bargain. Mr. Quintana has pled guilty to Second Degree Murder, and he has been sentenced to 30 years in prison in the Department of Corrections. One of the explicit conditions of that plea was that he testify in this trial against [defendant].... [Quintana] will testify to [defendant] taking that bat. He will testify to [defendant] striking [the victim] in the head. He will provide the excruciating detail about the sound that no one would ever want to hear, of a baseball bat coming into contact with human bone.

¶ 15 However, when the prosecutor called Quintana to testify, Quintana's response to the trial court's administration of the oath was, "Yeah, I ain't got nothing to say." The court excused the jury and questioned Quintana. Quintana persisted in his refusal to testify, and the court held him in contempt.

¶ 16 The court then asked counsel if they requested "any advisal or instructions to the jury in regard to that previous encounter." The prosecutor asked for an instruction like that given after a prosecution witness had refused to testify in *People v. Mares,* 263 P.3d 699 (Colo.App.2011). Defense counsel objected, arguing that an instruction on Quintana's refusal to testify would raise a prejudicial inference of defendant's guilt on which the defense could not cross-examine him.

¶ 17 The court reasoned that because the prosecutor had mentioned Quintana and his plea agreement in opening statement,

> that information or the information sought is already before the jury.... [G]iven the fact that the information regarding the previous agreement is before the jury, the guilty plea is before the jury, and the explicit condition is already before the jury by way of opening statement, I do intend to advise the jury consistent with *Mares,* but also consistent with what was indicated by counsel in the opening statement.

¶ 18 Defense counsel again objected but asked that, if the court did intend to give the *Mares* instruction, it advise the jury that the instruction was being offered for a limited purpose and Quintana's refusal to testify could not be considered as evidence of defendant's guilt. The prosecutor responded that he believed the jury "has every right to consider [Quintana's] refusal to testify and the Court's instruction and what that means." The court then stated that it intended to instruct the jurors that they could consider Quintana's refusal to testify and give it whatever weight they wanted; however, the court's instruction did not contain such language. The court ultimately instructed the jury:

> Ladies and gentlemen of the jury, I'm going to read you an instruction. This instruction is read to you for the limited purpose of giving you a sense of the—it's being offered for the limited purpose of [sic] the conduct of the last witness. The prosecution called as [its] last witness Mr. Adrian Quintana. Mr. Quintana appeared in the courtroom. Mr. Quintana refused to

testify. You are advised that Mr. Quintana had entered into an agreement to testify as a condition of a guilty plea related to his conduct in this case. When you exited, the Court ordered Mr. Quintana to testify. He continued to refuse to testify, so I held him in contempt of court and ordered that he be removed from the courtroom.

¶ 19 In closing argument, the prosecutor did not mention Quintana's refusal to testify or make any references to what Quintana had told the police. During deliberations, the jury submitted the following question: "Can we consider [Quintana's] lack of testifying in our discussion?" The court responded that "[o]pening statements of counsel are not evidence in the case. You have [received] all of the evidence you may properly consider in this case."

¶ 20 After the jury convicted defendant, he moved for a new trial pursuant to Crim. P. 33 based on allegations of error relating to Quintana's refusal to testify. The trial court held a hearing and then denied the motion.

 ¶ 21 Defendant argues that the trial court erred in failing to instruct the jury not to consider Quintana's refusal to testify as evidence of his guilt and in informing the jury about Quintana's plea agreement. Defendant preserved this issue by objecting to the trial court's instruction and requesting an instruction, which the court refused to give, that the jury should not draw any inferences regarding his guilt from Quintana's refusal to testify. We agree with defendant that the court's instruction was erroneous.

¶ 22 In *Mares,* after a prosecution witness refused to testify despite the prosecutor's assurances that it did not intend to charge him with any offense, the trial court instructed the jury:

Ladies and gentlemen of the jury, the prosecution called as [its] next witness [A.A.]. He appeared in the courtroom. He invoked his Fifth Amendment right not to testify. I made an inquiry and made a determination that he did not have a Fifth Amendment right not to testify. I ordered him to testify. He informed me that he

was continuing to refuse to testify. So I held him in contempt of court and ordered that he be removed from the courtroom.

263 P.3d at 702. The division recognized that the court's reference to the Fifth Amendment in its instruction could give rise to an impermissible inference of the defendant's guilt; however, the court concluded the instruction did not constitute reversible error. *Id.* at 703.[1]

¶ 23 Here, the trial court's instruction went well beyond the instruction in *Mares.* The court instructed the jury that Quintana had "entered into an agreement to testify as a condition of a guilty plea related to his conduct in *this* case." (Emphasis added.) This information, although referenced in the prosecutor's opening statement, was never introduced into evidence. Therefore, there was no reason for the court to have included it in the instruction. *See United States v. Hansen,* 544 F.2d 778, 780 (5th Cir.1977) ("[T]here is no need to advise the jury or its prospective members that someone not in court, not on trial, and not to be tried, has pleaded guilty. The prejudice to the remaining parties who are charged with complicity in the acts of the self-confessed guilty participant is obvious.").

 ¶ 24 The guilty plea of a codefendant may not be used as substantive evidence of a defendant's guilt. *People v. Brunner,* 797 P.2d 788, 789 (Colo.App.1990). Thus, even when a court properly admits such evidence for other purposes, such as to impeach a testifying codefendant's credibility, the trial court "should normally instruct the jury that the evidence may be used only for limited purposes and may not be used as substantive evidence of another's guilt." *Id.* It necessarily follows that the People's and the trial court's position that the jury could consider Quintana's refusal to testify for any purpose was erroneous.

¶ 25 We therefore conclude that the trial court's instruction regarding Quintana's guilty plea constituted error because it may have given rise to an impermissible inference

---

1. The *Mares* division did not "approve" the instruction given in that case; it held only that

under the circumstances presented, the instruction did not constitute reversible error.

of defendant's guilt, which was not cured by any limiting language.

### B. Was the Error Reversible?

¶ 26 The parties agree that defendant preserved the error, but they disagree over whether we should review this error under a constitutional or nonconstitutional harmless error standard.

¶ 27 No Colorado cases precisely address this issue. However, cases from other jurisdictions have reviewed similar errors for constitutional error because of the potential that evidence of a codefendant's guilty plea or conviction will violate a defendant's Sixth Amendment rights. For example, in *United States v. Ofray–Campos,* the United States Court of Appeals for the First Circuit explained:

> [T]he judge's response to [a jury question], in which he confirmed for the jury that the thirty-seven co[ ]defendants who did not appear at trial were in prison for their participation in a conspiracy, constituted new evidence, delivered to the jury from the bench rather than the witness stand, and unaccompanied by any of the safeguards of a criminal trial, in violation of [the defendants'] Sixth Amendment rights. Thus, the jury's exposure to [this] extrinsic information amounts to an error of constitutional dimension.... [T]he Sixth Amendment requires that a jury's verdict must be based solely upon the evidence developed at trial.

534 F.3d 1, 19, 24 (1st Cir.2008) (citation omitted). Likewise, in *United States v. De La Vega,* the Eleventh Circuit stated that "in most occasions, the admission of a co[ ]defendant's guilty plea will substantially affect the defendant's right to a fair trial in that the jury may regard the issue of the remaining defendant's guilt as settled and that the trial is a mere formality." 913 F.2d 861, 866 (11th Cir.1990) (internal quotation marks and alteration omitted).

¶ 28 Other courts have similarly concluded that an improper mention of a codefendant's guilty plea or conviction may constitute constitutional error. *United States v. Blevins,* 960 F.2d 1252, 1262 (4th Cir.1992) ("[T]he error in introducing the guilty pleas of non[ ]testifying co[ ]defendants is of constitutional dimension."); *United States v. Rogers,* 939 F.2d 591, 594 (8th Cir.1991) ("[R]eference to [guilty] pleas [of codefendants] obviously is capable of seriously prejudicing the defendant's right to a fair trial."); *Mindock v. State,* 187 Ga.App. 508, 370 S.E.2d 670, 672 (1988) ("To let the jury know that all [the other] defendants have pled guilty .... is extremely prejudicial and denies [the defendant] his right to a fair trial."); *State v. Lotter,* 255 Neb. 456, 586 N.W.2d 591, 626–27 (1998) ("[E]vidence of a codefendant's conviction ... denied the defendant her right to a fair trial" because "[i]n using another jury's verdict as evidence, there is the insidious invitation to trust and substitute another jury's judgment rather than fairly deliberate evidence in a present prosecution.") (internal quotation marks omitted).

¶ 29 Additionally, some courts have explicitly applied a constitutional harmless error standard when information regarding a codefendant's guilty plea or conviction has been introduced at trial. *United States v. Johnson,* 26 F.3d 669, 677 (7th Cir.1994) (finding reversible error when a codefendant's guilty plea or conviction is mentioned in a defendant's trial unless the error is "rendered harmless beyond a reasonable doubt"); *Blevins,* 960 F.2d at 1262 (concluding that the admission of the guilty pleas of nontestifying codefendants is a trial error to which harmless error analysis should be applied and stating that "[i]n deciding whether a constitutional error was harmless, a reviewing court must be satisfied that the error was harmless beyond a reasonable doubt"); *see also Ofray–Campos,* 534 F.3d at 22.

¶ 30 We agree that mentioning a codefendant's guilty plea may violate a defendant's Sixth Amendment right to a fair trial by an impartial jury. Additionally, introducing information regarding a nontestifying codefendant's guilty plea raises Confrontation Clause concerns:

> [B]y not having the opportunity to cross-examine the co[ ]defendant who entered the guilty plea, the defendant on trial is unable to probe the motivations for entry of the plea [and] [t]his significantly undercuts the defendant's right·to have a jury's

verdict based only upon evidence that is presented in open court and is thereby subject to scrutiny by the defendant.

*Blevins,* 960 F.2d at 1260.

¶ 31 Accordingly, we review the trial court's error in instructing the jury regarding Quintana's guilty plea under a constitutional harmless error standard. Constitutional error requires reversal unless the People prove that the error was harmless beyond a reasonable doubt. *Hagos v. People,* 2012 CO 63, ¶ 11, 288 P.3d 116. An error is not harmless beyond a reasonable doubt "if there is a reasonable possibility that the error might have contributed to the conviction." *Id.* (internal quotation marks and alterations omitted).

¶ 32 The Eighth Circuit has supplied a useful framework for analyzing prejudice in this context:

> A reviewing court must carefully scrutinize the facts and circumstances of the manner in which the [codefendant's guilty] plea was used. It is essential to consider such factors as whether the court gave the jury a limiting instruction, whether there was a proper purpose in introducing the fact of the guilty plea, [and] whether the plea was improperly emphasized or used as substantive evidence of guilt.

*Rogers,* 939 F.2d at 594 (internal quotation marks omitted).

¶ 33 Regarding limiting instructions, courts considering similar issues have concluded that whenever evidence of a codefendant's guilty plea or conviction is introduced, a cautionary instruction limiting the jury's use of the guilty plea is required. *See, e.g., Blevins,* 960 F.2d at 1260 ("[A]ny mention of guilty pleas of nontestifying co[ ]defendants should be avoided at trial wherever possible.... If for whatever reason the jury does learn that co[ ]defendants have pleaded guilty, the court upon request should issue a limiting instruction to jurors stating that the evidence of such guilty pleas is not to be taken as substantive evidence of guilt of the remaining defendants."); *United States v. Baez,* 703 F.2d 453, 455 (10th Cir.1983) ("Because of the potential for prejudice, cautionary instructions limiting the jury's use of the guilty plea to permissible purposes are critical.");

*Lotter,* 586 N.W.2d at 627–28 ("[E]ven when ... evidence [of a codefendant's guilty plea] is admissible, a curative instruction is required when requested by defense counsel" because "[w]ithout instruction, it is possible the jury could use the pleas as evidence of [the defendant's] guilt.").

¶ 34 No such cautionary instruction was given here. Moreover, no proper purpose was served by the trial court's reference to Quintana's guilty plea. Quintana did not testify, and thus his plea could not be used to impeach his credibility. Also, the court did not need to provide that information to explain to the jury that Quintana had refused to testify.

¶ 35 Finally, the trial court's reference to Quintana's guilty plea improperly emphasized that information. The prosecutor did mention Quintana's plea agreement in opening statement. A passing reference in opening statements, however, may not be prejudicial in the context of a lengthy trial. The same cannot be said for the trial court's statement here. *See Ofray–Campos,* 534 F.3d at 21 ("[T]he undisputably extrinsic information [of the nontestifying codefendant's convictions] was supplied to the jury by the trial court itself ... and thus essentially was offered to the jury as evidence."); *id.* at 25 ("It is also important, in considering prejudice, that [this information] was supplied by the trial judge, and thus stamped with the imprimatur of the court, rather than by comparatively less authoritative sources, such as prosecutorial comment [or] juror misconduct.").

¶ 36 We conclude that, under these circumstances, the trial court's error in instructing the jury regarding Quintana's plea agreement and its refusal to include any caution that such information could not be used as evidence of defendant's guilt was not harmless beyond a reasonable doubt. Although the evidence of defendant's guilt that was properly introduced at trial was considerable, "[t]he inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the

error." *Blecha v. People,* 962 P.2d 931, 942 (Colo.1998) (internal quotation marks omitted).

¶ 37 Especially considering the jury's question during deliberations regarding whether it could consider Quintana's refusal to testify, we conclude that there was a reasonable possibility that the trial court's error might have contributed to defendant's convictions. *See Ofray–Campos,* 534 F.3d at 25 (discussing the fact that the jury returned with a verdict only forty-five minutes after the trial court answered a jury question by informing the jury that the defendants' codefendants were in prison and stating this was "clearly information that was material to the jury's verdict"); *United States v. Griffin,* 778 F.2d 707, 711 (11th Cir.1985) (given that the jury had deadlocked for several hours and questioned the court whether the defendant's co-conspirator had been simply indicted or tried and convicted, "[o]bviously, the question of [the coconspirator's] guilt played a significant role in the . . . jury's deliberations").

¶ 38 "[A] defendant is entitled to have the question of his guilt determined upon the evidence against him, not on whether a codefendant . . . has been convicted of the same charge." *Ofray–Campos,* 534 F.3d at 22–23 (internal quotation marks omitted). Because we cannot say with the constitutionally required assurance that the error did not contribute to defendant's convictions, the convictions must be reversed and defendant must receive a new trial.

### III. Issues That May Recur on Remand

¶ 39 Because we reverse defendant's convictions due to the erroneous instruction on Quintana's refusal to testify and his plea agreement, we need not determine whether any of the other alleged errors by themselves or cumulatively also require reversal. We do, however, address some of defendant's

other contentions because similar issues may arise on retrial.

### A. Instructions on Affirmative Defense and Exceptions to Self–Defense—Law

¶ 40 "The trial court has a duty to correctly instruct the jury on all matters of law for which there is sufficient evidence to support giving instructions." *Cassels v. People,* 92 P.3d 951, 955 (Colo.2004). "We review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law." *People v. Smoots,* 2013 COA 152, ¶ 5, —— P.3d —— (internal quotation marks omitted).

¶ 41 Colorado law provides that "[i]f the issue involved in an affirmative defense is raised, then the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the offense." § 18–1–407(2), C.R.S.2013. Thus, once a defendant meets his burden of going forward with an affirmative defense, "the prosecution has the burden of disproving the claimed affirmative defense beyond a reasonable doubt." *People v. Garcia,* 113 P.3d 775, 784 (Colo.2005).[2]

¶ 42 A trial court should instruct the jury concerning an exception to an asserted affirmative defense if some evidence supports the exception. *People v. Zukowski,* 260 P.3d 339, 347 (Colo.App.2010). Whether sufficient evidence supports a requested jury instruction is a question of law we review de novo. *People v. Coughlin,* 304 P.3d 575, 587 (Colo.App.2011). We view the evidence in the light most favorable to the giving of the instruction. *People v. Silva,* 987 P.2d 909, 914 (Colo.App.1999).

### B. Instructions on the Provocation Exception to Self–Defense

¶ 43 The trial court instructed the jury in Jury Instruction 27 that it is an

---

2. Because there was evidence that the victim's group (Garcia's group) was attacking Vigil's car before defendant and Quintana attacked the victim, and a person is entitled to use reasonable force in defense of others if certain conditions are met, the trial court properly determined that defendant was entitled to an instruction on the affirmative defense of self-defense. Defendant contends, the People concede; and we agree that

the court erred in instructing the jury that "[t]he prosecution has the burden of *disproving* the guilt of the defendant . . . beyond a reasonable doubt as to the affirmative defense, as well as to all the elements of the crime charged," rather than correctly stating that the prosecution has the burden of *proving* the guilt of the defendant beyond a reasonable doubt. (Emphasis added.)

affirmative defense to first degree murder and second degree murder that the defendant "used deadly physical force" in self-defense. It also instructed the jury in Jury Instruction 29 that it is an affirmative defense to first degree murder, second degree murder, first degree assault, second degree assault, and third degree assault that the defendant "used physical force upon another person" in self-defense.

¶ 44 In addition to explaining what circumstances must exist for defendant's use of physical force to constitute self-defense, both instructions also stated: "The defendant is not justified in using physical force if: 1. with intent to cause bodily injury or death to another person, 2. he provoked the use of unlawful physical force by that person."

¶ 45 Defendant argues that the trial court erred in instructing the jury on the provocation exception to self-defense because the evidence did not warrant giving these instructions. We agree that these instructions should not have been given. Accordingly, on retrial, if the same or similar evidence is presented, the trial court should not instruct the jury on the provocation exception to self-defense.

■■ ¶ 46 The trial court's instructions on the provocation exception tracked the language of the statute, *see* § 18–1–704(3)(a), C.R.S.2013, and thus were technically correct statements of law, *see Kaufman v. People,* 202 P.3d 542, 549 (Colo.2008). However, "the court should not instruct on an abstract principle of law unrelated to issues in controversy." *Silva,* 987 P.2d at 913 (citing *People v. Goedecke,* 730 P.2d 900 (Colo.App.1986) (instructions must reflect evidence produced at trial)).

¶ 47 A division of this court explained in *Silva* that "[a]n instruction on provoking the victim ... should be given if (1) self-defense is an issue in the case; (2) the victim makes an initial attack on the defendant; and (3) the defendant's conduct or words were intended to cause the victim to make such attack and provide a pretext for injuring the victim." *Id.* at 914. We agree with *Silva* that the plain language of the statute requires that, in order for a defendant to forfeit self-defense under the provocation exception,

the defendant must act with the intent to provoke the victim into attacking first. *See id.* Because no evidence was presented at trial that the victim made an initial attack on defendant or that defendant's conduct or words were intended to cause the victim to attack first, it was error for the trial court to give the jury an instruction on the provocation exception to self-defense.

### C. Instructions on the Combat–by–Agreement Exception to Self–Defense

■■ ¶ 48 The trial court instructed the jury in Jury Instruction 27, the use of deadly force instruction, and Jury Instruction 29, the use of physical force upon another person instruction, that "[t]he defendant is not justified in using physical force if: 1. the physical force involved is the product of combat by agreement, and 2. the combat is not specifically authorized by law." Defendant argues that the court erred in failing to instruct the jury on the elements of combat-by-agreement and the prosecution's burden to prove the elements. We agree that the instructions on combat-by-agreement were insufficient.

¶ 49 The court's combat-by-agreement instructions tracked the language of the "physical force in defense of a person" statute. *See* § 18–1–704(3)(c) ("[A] person is not justified in using physical force if: [t]he physical force involved is the product of a combat by agreement not specifically authorized by law."). The statute does not provide any additional guidance on the exception; however, the Colorado Supreme Court has held that "in order to establish mutual combat, the prosecution must prove that [1] an agreement to fight existed between the parties, and that [2] the parties entered into the agreement before beginning combat." *Kaufman,* 202 P.3d at 561.

¶ 50 In *People v. Cuevas,* a division of this court explained that, when the evidence creates a factual issue for the jury to determine, thus justifying giving an instruction on combat-by-agreement, the jury should be instructed that the prosecution must prove these two elements. 740 P.2d 25, 26 (Colo.

App.1987). The jury also should be instructed that "if [it] were to find that there was at least a reasonable doubt as to there being combat by agreement, [it] should consider whether [the] defendant was acting in self-defense." *Id.* The division concluded that without these additional instructions, the instruction the trial court gave on combat-by-agreement in *Cuevas* was misleading and thus erroneous. *Id.* at 25–26.

¶ 51 We agree with the *Cuevas* division that a combat-by-agreement instruction that does not state the elements that must be established or that the prosecution has the burden to prove these elements beyond a reasonable doubt is erroneous because it does not adequately inform the jury how to apply the statutory exception to the facts of the case. We thus conclude that the instructions on combat-by-agreement given in this case were insufficient. If the issue arises on retrial, the trial court must instruct the jury in accordance with *Cuevas*.

### IV. Conclusion

¶ 52 The judgment of conviction is reversed and the case is remanded for a new trial.

JUDGE CASEBOLT and JUDGE DAILEY concur.